**In re GRAND JURY SUBPOENAS DATED MARCH 9, 2001**

**No. M11–189(DC).**

United States District Court, S.D. New York.

Dec. 13, 2001.

Mary Jo White, United States Attorney for the Southern District of New York by Evan T. Barr, Jonathan N. Halpern, Assistant United States Attorneys, New York, NY, for the Government.

Kirkland & Ellis, Washington, DC by Laurence A. Urgenson, for Marc Rich.

Fried Frank Harris Shriver & Jacobson, New York, NY by Audrey Strauss, Lankler Siffert & Wohl LLP, New York, NY by John S. Siffert, Stillman & Friedman, New York, NY by Peter Chavkin, Hafetz & Necheles, New York, NY by Frederick P. Hafetz, Solomon, Zauderer, Ellenhorn, Frischer & Sharp, New York, NY by David Ellenhorn, Jonathan Lupkin, for Respondent Lawyers.

## *OPINION*

CHIN, District Judge.

### (REDACTED) *

On January 20, 2001, his last day in office, President Clinton granted uncondi-tional pardons to Marc Rich and Pincus Green. Rich and Green had been indicted in 1983 in this District for wire fraud, mail fraud, racketeering, conspiracy, tax evasion, and trading with the enemy. The pardons terminated the criminal proceedings after repeated efforts by Rich and Green and their lawyers to persuade the U.S. Attorney's Office for the Southern District of New York (the "Southern District" or the "Government") to drop the charges had failed.

The pardons were highly controversial and generated much public outcry: Rich and Green were absolved of criminal liability, even though they had refused for some 17 years to return to the United States to stand trial. In addition, the pardon petition was submitted directly to the White House, with no notice to the prosecutors who had brought the charges or to the Pardon Attorney at the Department of Justice.

In February 2001, the Southern District commenced an investigation into the circumstances surrounding the granting of the pardons. On or about March 9, 2001, the grand jury issued subpoenas duces tecum to the five lawyers (the "Marc Rich Lawyers") who had represented Rich and Green in connection with their pardon application. The Marc Rich Lawyers provided some evidence in response to the subpoenas, but they objected to providing certain other documents and testimony on

---

* This is a redacted version of an Opinion that I have today filed under seal. This matter is presently before the grand jury, and the motion papers were sealed and oral argument was heard in a closed courtroom. Nonetheless, I have not used pseudonyms in this redacted Opinion because it would be impossible to meaningfully discuss the issues without identifying the participants. Moreover, there is no need for anonymity: most of the materials cited in this Opinion are in the public record; the existence of the investigation is a matter of public record; and the Rich and Green pardons have been the subject of numerous reports in the media as well as public hearings before Congress. I have cited public sources wherever possible and I have redacted references to grand jury materials. *See, e.g., In re Lindsey,* 148 F.3d 1100 (D.C.Cir.) (using actual names and deleting only sealed material in opinion addressing privilege issues raised in grand jury proceedings), *published in full at* 158 F.3d 1263 (D.C.Cir.), *cert. denied,* 525 U.S. 996, 119 S.Ct. 466, 142 L.Ed.2d 418 (1998).

the basis of the work product doctrine and attorney-client privilege.

Before the Court is the Government's motion to compel production of certain of the withheld documents and testimony. The motion is granted.

The work product doctrine protects a lawyer's work product, prepared "in anticipation of" or "because of" litigation, from unnecessary intrusion by adversaries. The attorney-client privilege protects confidential communications made for the purpose of obtaining legal advice. Here, once Rich and Green decided to seek presidential pardons, the Marc Rich Lawyers ceased providing legal services in an adversarial context. They faced no opposing parties or adversaries and the pardon proceedings were entirely *ex parte*. Rich and Green had been fugitives for some 17 years, the parties had reached an impasse, and it was clear that there would be no further litigation of the criminal charges. The Marc Rich Lawyers were acting principally as lobbyists, working with public relations specialists and individuals—foreign government officials, prominent citizens, and personal friends of the President—who had access to the White House. They were not acting as lawyers or providing legal advice in the traditional sense. Accordingly, the objections based on the work product doctrine and attorney-client privilege are overruled, to the extent set forth below.

## BACKGROUND

### A. The Criminal Charges

In the early 1980's, the Southern District began investigating Rich and Green for alleged violations of the federal income tax and oil price control laws. Rich and Green were principals in Marc Rich & Co., A.G., a commodities firm headquartered in Switzerland; at the time Rich and Green were U.S. citizens based in New York. (*See They Went Thataway: The Strange Case of Marc Rich and Pincus Green*, H.R.Rep. No. 537, 102d Cong., 2d Sess. at 2 (1992) (submitted as GX 2);[1] Statement of M. Weinberg, Jr. & M.J. Auerbach, Hearings Before House Comm. on Gov't Reform, 107th Cong., 1st Sess., at 3–5 (Feb. 8, 2001) (submitted as GX 3)). A grand jury began investigating Rich and Green in April 1982. *See Action, S.A. v. Marc Rich & Co.*, 951 F.2d 504, 506 (2d Cir.1991).

In August 1982, Rich became naturalized as a citizen of Spain, purporting to renounce his U.S. citizenship. *Id.* Rich and Green also acquired Israeli citizenship. (Petitioners' Application for Pardon, at 1, 3) (submitted as GX 1).

A few months later, the Southern District informed counsel for Rich and Green that their clients were about to be indicted. (GX 3, at 8–9). Through counsel, Rich and Green sought to resolve the matter by offering to pay a fine in return for a dismissal or reduction of the criminal charges, but the Government rejected the proposal. (*Id.* at 9; *see also* GX 2, at 3). Apparently, in June 1983, while the discussions were pending, Rich and Green left the United States. (GX 2, at 3; GX 3, at 9). They never returned.

In September 1983, the grand jury issued a 51–count indictment against Rich, Green, and others, for wire fraud, mail fraud, racketeering, racketeering conspiracy, tax evasion, and trading with the enemy. The Government filed a 65–count superseding indictment in March 1984.

In July 1984, the United States sought to extradite Rich and Green to Switzerland to stand trial on the superseding indict-

---

**1.** "GX" refers to the Government's exhibits submitted in support of its motion to compel; "RX" refers to the exhibits jointly submitted by the Marc Rich Lawyers and Rich.

ment. In September 1984, the Swiss authorities denied the request because extradition on the charges in issue was not permitted under Swiss law. The Government did not seek Rich's extradition from Spain because the Spanish government advised that Rich, as a naturalized Spanish citizen, was not subject to extradition. Likewise, U.S. officials were advised that Israel would not extradite Rich or Green. (GX 2, at 9).

In October 1984, Marc Rich & Co., A.G. and Marc Rich & Co. International, Ltd. pled guilty to false statement and tax evasion charges. They were ordered to pay fines and penalties in excess of $150 million.[2]

## B. *Rich and Green Seek To Persuade The Government To Drop The Charges*

In the years following the indictment, Rich and Green retained a number of attorneys who made repeated efforts to persuade the Southern District to drop the criminal charges.

In 1985, Rich and Green asked Leonard Garment to represent them. Garment, Lewis Libby, Robert Fink, and other lawyers analyzed the charges and made a presentation to the Southern District in 1987, but the effort to persuade the prosecutors to "re-examine" the charges was unsuccessful. (*See* Testimony of Lewis Libby, Hearings Before House Comm. on Gov't Reform (Mar. 5, 2001)) (submitted as RX 5). The lawyers later retained two professors, experts in tax law, to assist in the analysis. In December 1990, the tax experts submitted a set of Proposed Findings of Fact and Conclusions of Law to the Southern District, arguing that Rich's company had correctly reported its income. (Letter from B. Wolfman to G.E. Lynch, dated Dec. 7, 1990, & Att.) (submitted as RX 6). The prosecutors were not persuaded.

In May 1994, two attorneys for Rich and Green, Lawrence A. Urgenson and Fink, met with the Southern District to discuss the Rich and Green case. The meeting was followed by a lengthy letter to the Southern District from Urgenson requesting further discussion and arguing that "the charges in the current indictment do not provide an appropriate basis for disposition of this case." (Letter from L. Urgenson to P. Fitzgerald, dated June 3, 1994) (submitted as GX 5). The Southern District responded as follows:

There is every reason to believe that if a full discussion of the evidence took place and convinced you that the Government could prove your clients' guilt, little would change. Your clients would continue their life on the lam—with, perhaps, another change of lawyers....

... [I]f your clients genuinely believe that they have done nothing wrong, they should board the next plane to New York and subject themselves to the jurisdiction of the Court. Even if you were unable to persuade the Government not to proceed on the Indictment, they would remain free to put forth their defense, including the testimony of the two eminent tax professors, before a jury with the assistance of able counsel....

Please be assured that if Marc Rich and Pincus Green are ever sufficiently serious about negotiations to surrender

---

2. As they argued in the pardon petition and as they continue to argue now, Rich and Green contend that the companies were essentially coerced into pleading guilty because of the freezing of assets, the imposition of contempt fines, and the threat of RICO forfeitures. (Resp't Mem. at 8 n. 8; Mem. accompanying Pardon Petition, at 26 (submitted as part of GX 1) ("The surrender by the companies was as unfair as it was inevitable.")).

to the jurisdiction of the Court, the Government will give you ample opportunity to persuade us that your clients are wrongly accused.

(Letter from P. Fitzgerald to L. Urgenson, dated June 27, 1994) (submitted as GX 6).

## C. *Rich and Green Explore Other Options*

Because it was apparent that the Southern District would not negotiate with Rich and Green unless they were willing to return to the United States, they and their lawyers began considering other options. In or about 1997, Fink met with Michael Steinhardt, a businessman, philanthropist, and friend of Rich. (*See* Resp't Mem. at 10). [redacted]

Steinhardt introduced Fink to Gershon Kekst, a well-known public relations consultant and philanthropist and president of a New York public relations consulting firm. ( [redacted]; Resp't Mem. at 11). [redacted]

In early 1999, Fink and Kekst spoke about the possibility of seeking a presidential pardon for Rich. Fink asked Kekst to recommend someone "who understood the entire political process"; Kekst said he thought that Jack Quinn, the former White House counsel, might be a person to employ for purposes of pursuing a pardon, if Rich ever decided to seek one. (Testimony of Robert Fink, Hearings Before House Comm. on Gov't Reform (Mar. 1, 2001)) (submitted as GX 13). In his testimony before the House Government Reform Committee, Fink explained his desire to find someone who understood the political process:

> I was the one who raised this, and I was wondering if he [Kekst] knew someone who I honestly expected then and still believe today, does not exist, who understands the whole political process. Because I was convinced, at least highly frustrated, with efforts to approach this simply as an attorney, and wondered if there was some other aspect to the way our government works that would allow us to get an opportunity to have Mr. Rich's case heard without him having to surrender.

(GX 13).[3]

[redacted] In July 1999, Rich retained Quinn and his partner at Arnold & Porter, Kathleen Behan. (Letter from K.A. Behan to M. Rich, dated July 21, 1999) (submitted as RX 29). The retainer agreement provided that Rich was engaging "Arnold & Porter ... to provide legal services and in connection with Mr. Rich's potential negotiations with the Department of Justice." (*Id.*).

## D. *Quinn's Efforts With The Prosecutors Fail*

On October 22, 1999, Quinn met with Deputy Attorney General Eric H. Holder, Jr. at the Justice Department. (Statement of E. Holder, Hearings Before House Comm. on Gov't Reform (Feb. 8, 2001)) (submitted as GX 11). Quinn asked Holder to "facilitate" a meeting with the Southern District so that Quinn could seek to

---

**3.** At the hearing, Representative Latourette pressed Fink on this issue:

> LATOURETTE: ... But, how I interpret it is ... that your best lawyering didn't seem to get the job done and so we need to go another way, and that is to find someone who has access to whomever.
> FINK: Well, actually, that is not true. At least it wasn't in my mind....

> But, I represent[ ] this to you. I'm under oath. I am not Washington wise. In fact, quite to the contrary. And I was looking for someone who had an overview of the entire political process. I didn't have the White House in mind. I didn't have anything in mind. In fact, you could have read my mind quickly.

(GX 13).

persuade the Southern District to drop the charges against Rich. The Southern District declined to meet and Holder did not press the matter.

On December 1, 1999, Quinn wrote a letter to Mary Jo White, the U.S. Attorney for the Southern District, urging her "to view this as a matter that can and should now be discussed with Mr. Rich's counsel without Mr. Rich being present." (Letter from J. Quinn to M.J. White, dated Dec. 1, 1999, at 2) (submitted as GX 12). Quinn argued that this was a case "where dialogue with counsel is appropriate even though Mr. Rich resides abroad." (*Id.* at 6).

By letter dated February 2, 2000, the Southern District responded, as follows:

> [T]he resolution that you contemplate, namely a dismissal or major modification of the indictment, is impossible. As we have repeatedly told a succession of lawyers who have approached our Office with similar applications, it is our firm policy not to negotiate dispositions of criminal charges with fugitives. Such negotiations would give defendants an incentive to flee, and from the Government's perspective, would provide defendants with the inappropriate leverage and luxury of remaining absent unless and until the Government agrees to their terms.

(Letter from S. Neiman to J. Quinn & K. Behan, dated Feb. 2, 2000) (submitted as GX 14).

The letter made it clear, if it was not already, that the prosecutors in the Southern District were not going to bend. As a consequence, as Quinn later acknowledged, "basically the legal work on this matter at all of these firms, Mr. Fink's, Mr. Libby's and so on, basically shut down sometime around the end of March [2000]." (Testimony of J. Quinn, Hearings Before House

Comm. on Gov't Reform, 2001 WL 206220, at *285 (Mar. 1, 2001)).

### E. *The Decision To Seek A Pardon*

Rich and his advisors began to shift gears as they pressed forward with the concept of seeking a presidential pardon.

The Southern District's response was relayed by Fink to Avner Azulay, a friend of Rich and director of the Marc Rich philanthropic foundation in Israel. Fink advised that the Southern District had responded that it would not negotiate while Rich was "away." (E–Mail from R. Fink) (submitted as part of GX 15). Azulay responded to Fink by writing: "The present impasse leaves us with only one other option: the unconventional approach which has not yet been tried and which I have been proposing all along." (E–Mail from A. Azulay to R. Fink, dated Feb. 10, 2000) (submitted as part of GX 15).

On March 18, 2000, Azulay sent Fink another e-mail, which stated:

> We are reverting to the idea discussed with Abe—which is to send DR on a 'personal' mission to NO 1., with a well prepared script. IF it works we didn't lose the present opportunity—until nov.—which shall not repeat itself.

(E–Mail from A. Azulay to R. Fink, dated Mar. 18, 2000) (submitted as GX 16). The reference to "Abe" was to Abraham Foxman, the national director of the Anti-Defamation League of B'nai B'rith, who apparently had suggested to Azulay in February that Rich consider asking his former wife, Denise Rich, to use her influence to approach the President about a pardon. (*See* A. Cowan, "Supporter of Pardon for Fugitive Has Regrets," *New York Times,* Mar. 24, 2001).

In October 2000, Rich and his advisors decided to seek a presidential pardon. (Testimony of J. Quinn, Hearings Before

House Comm. on Gov't Reform, at 7 (Feb. 8, 2001); Testimony of Robert Fink, Hearings Before House Comm. on Gov't Reform, at 5 (March 1, 2001)) (submitted together as GX 17). [redacted]

On or about November 14, 2000, Azulay met with Kekst [redacted]. On November 15, 2000, Azulay summarized his meeting with Kekst in an e-mail he sent to Behan, Fink, and apparently Rich. The e-mail discusses "the idea of presenting the request for a P" and discusses possible supporters, timing, and the potential for "[m]edia and public criticism." There is some limited discussion of the Department of Justice and the Southern District. (E–Mail from A. Azulay to K. Behan, R. Fink & M. Rich, dated Nov. 15, 2000) (submitted as GX 20).

[redacted]

In anticipation of a meeting scheduled for November 20, 2000, Fink prepared a draft agenda of items for discussion. While the agenda does contain items that would arguably fall under the rubric of legal strategy, most of the items, including the following, did not fall into the category of legal work: "Identification of person of high moral authority, identify who (singular and plural) will make the approach"; "Identification of potential supporters who will write letters"; "Identify anyone who should send letters directly, rather than 'To Whom It May Concern' "; "A need for secrecy and possibility/likelihood of potential leaks"; "Maximizing use of Gershon"; and "Maximizing use of D.R. and her friends." (E–Mail from R. Fink to J. Quinn, G. Kekst, & K. Behan, dated Nov. 19, 2000 & Att.) (submitted as GX 22).

[redacted]

## F. *The Filing of the Petition*

On December 11, 2000, the pardon petition (the "Petition") was delivered to the White House. (Statement of Rep. S. La-tourette, Hearings Before House Comm. on Gov't Reform, 2001 WL 206220, at *68 (Mar. 1, 2001)). The Petition was addressed to the President of the United States and begins by stating that "[p]etitioners Marc Rich and Pincus Green pray for a pardon." (Petition, at 1) (submitted as part of GX 1). The 4–page Petition was accompanied by a 32–page memorandum as well as supporting letters attesting to Rich's character and philanthropic activities. (GX 1). A portion of the memorandum set forth legal arguments, which were similar to the arguments that Rich and his lawyers had been urging on the Government since 1985 (Resp't Mem. at 8), but most of the memorandum was devoted to providing personal and background information and excerpts from the supporting letters. The memorandum also addressed the unavailability of other alternatives for resolving the criminal charges:

> [The] refusal by the United States government even to engage in a discussion of the merits of the case leaves Mr. Rich and Mr. Green in an untenable position: the only way for them to exonerate themselves is to come to the United States, face immediate incarceration and a certain media circus, and stand trial. However, as a practical matter, this option is illusory. The corporations were forced to plead guilty to save themselves, and that will forever stain the hopes of a fair trial. And the U.S. Attorney's Office has refused to even consider Mr. Rich's and Mr. Green's position that they, in fact, are not guilty of the criminal charges. As a result, a negotiated resolution seems impossible. *Under the circumstances, then, this case will not be resolved through trial, settlement or the withdrawal of the indictment.* The only process that will resolve the controversy and allow Mr. Rich and Mr. Green the full opportunity to pursue their humanitarian efforts

(without requiring the United States Attorney's Office to confess any error), is for the President of the United States to pardon Mr. Rich and Mr. Green.

(GX 1, at 30) (emphasis added).

The Petition was transmitted by a cover letter from Quinn to the President that read in part:

> I am personally delivering this Application for Pardon for Marc Rich and Pincus Green because almost two decades of using ordinary channels have led this matter to an impasse.... Far more importantly, I appear because I am absolutely certain that a grave injustice has been done that can only be rectified by you through an act of Executive Clemency.

(Letter from J. Quinn to President Clinton, dated Dec. 11, 2000) (submitted as Exh. 12, Hearings Before House Comm. on Gov't Reform (Mar. 1, 2001)).

No copy of the Petition was filed with the Pardon Attorney at the Department of Justice.

### G. *Post–Petition Lobbying*

Once the Petition was submitted [redacted], Rich and his advisors embarked on a comprehensive lobbying campaign in support of the pardon. [redacted]

Denise Rich submitted two letters in support of the Petition and spoke with President Clinton in person at a White House social event. (E–Mail from R. Fink to K. Behan & J. Quinn, dated Dec. 19, 2000; E–Mail from R. Fink to J. Quinn, dated Dec. 19, 2000 (submitted together as GX 24); Statement of J. Quinn, Hearings Before Senate Judiciary Comm., at 10–11 (Feb. 14, 2001) (submitted as GX 25)).

Beth Dozoretz, described by Quinn as a "close friend of Denise Rich" and a "good friend" and "political supporter" of President Clinton, was approached by Quinn

and asked to contact the President about the pardon request. She did so on at least two occasions. (GX 25, at 11–12).

Quinn contacted the President directly. On January 5, 2001, Quinn wrote a letter to President Clinton, which stated, in part:

> On a personal note, I believe in this cause with all my heart. When first approached about getting involved, I was highly skeptical. But, I studied the facts and the law carefully and became convinced of both Marc's innocence and the outrageously prejudicial and unfair treatment of him by the then-new U.S. Attorney in New York, Mr. G[iu]lliani.

(Letter from J. Quinn to President Clinton, dated January 5, 2001) (submitted as GX 26). Quinn also spoke to the President by telephone about the pardon application. (Testimony of J. Quinn, Hearings Before House Comm. on Gov't Reform, 2001 WL 206220, at *273–74 (Mar. 1, 2001)).

A number of prominent individuals in Israel also contacted the President about the Pardon. These included then-Prime Minister Ehud Barak and former prime minister Shimon Peres. (E–Mail from richfnd to J. Quinn, dated Dec. 25, 2000; E–Mail from azulrich to J. Quinn *et al.*, dated Jan. 12, 2001) (submitted together as GX 28).

Rich's representatives also contacted White House Chief of Staff John D. Podesta, White House Counsel Beth Nolan, and Deputy White House Counsel Bruce Lindsey to enlist their support. Podesta, Nolan, and Lindsey, however, were not willing to support the application and indeed opposed it because, in their view, Rich and Green were fugitives. (Testimony of Peter Kadzik, Hearings Before House Comm. on Gov't Reform (Mar. 1, 2001) (submitted as GX 29); Testimony of John D. Podesta & Beth Nolan, Hearings Before House Comm. on Gov't Reform (March 1, 2001)

(submitted as GX 30); Resp't Mem. at 15). Rich's attorneys, in their communications with the White House, continually pressed the point that Rich and Green were not fugitives.[4]

On January 10, 2001, Quinn sent Holder a copy of the letter he had previously sent the President, with a cover note that read:

Dear Eric: I hope you can say you agree with this letter. Your saying positive things, I'm told, would make this happen. Thanks for your consideration. Sincerely, Jack

(Letter from J. Quinn to E. Holder, dated Jan. 10, 2001) (submitted as GX 31). Quinn followed with a phone call to Holder on January 19, 2001, in Holder's words, "the last full day of the Clinton Administration." (GX 11, at 3). Shortly thereafter, when he received a phone call from Nolan, he told her that because, as he had learned, Prime Minister Barak was supporting the pardon request, he "was now 'neutral, leaning towards favorable.'" (Id.).

On January 19, 2001, in a 20–minute conversation, Quinn spoke directly with the President about the Petition. In response to a question from the President about the statute of limitations for civil claims, Quinn said his clients would waive the defense. The President asked for a letter to that effect and one was delivered promptly. (GX 25, at 12; Letter from J. Quinn to President Clinton, dated Jan. 19, 2001 (submitted as RX 4)).

## H. The Pardons

On January 20, 2001, President Clinton granted full and unconditional pardons to 140 individuals. On the list were Marc Rich and Pincus Green.

Intense public scrutiny followed. Rich's advisors immediately began formulating a response, with Azulay and Kekst playing major roles. [redacted] Azulay reminded the others that "we agreed that all inquiries, interviews should be channeled to gershon." (E-mail from A. Azulay to J. Quinn et al., dated Jan. 22, 2001) (submitted as part of GX 32).

Within days the House Committee on Government Reform commenced an investigation into the granting of the pardons and issued requests to, among others, the lawyers for Rich and Green for documents and testimony. The Senate Judiciary Committee later held hearings as well. On February 28, 2001, New York State tax authorities filed a Notice of Deficiency against Rich seeking more than $137 million in alleged tax liabilities, citing allegations set forth in the indictment.

## I. The Subpoenas

In February 2001, the grand jury commenced an investigation into the circumstances surrounding the Rich and Green pardons. The subpoenas in question were issued to the Marc Rich Lawyers on or about March 9, 2001. Each subpoena sought, among other things, the production

---

4. For example, in a letter to Lindsey, Quinn wrote:

You expressed a concern that [Rich and Green] are fugitives; and I told you they are not. Here is why: Rich and Green were in fact residing in Switzerland when they were indicted in September 1983. They (understandably in my mind) chose not to return to the U.S. for a trial in light of all that had happened to them; particularly the enormous and overwhelmingly adverse and prejudicial publicity generated, I am sure, by then U.S. Attorney G[iu]liani. Their failure to return to New York was not a crime and no one has ever accused them of a crime for failing to come to the U.S. for a trial.

(Letter from J. Quinn to B. Lindsey, dated Dec. 19, 2000 (submitted as RX 14); see also Letter from J. Quinn to President Clinton, dated Jan. 18, 2001 (submitted as RX 16)).

of documents for the period from January 1, 1999 to the present relating to:

> Any and all efforts to obtain a(a) resolution of the outstanding criminal charges against Marc Rich or Pincus Green (including matters relating to Rich or Green's return to the United States or conditions of release) in connection with the indictment or superseding indictment filed in the Southern District of New York, including but not limited to, contacts with the White House or the United States Department of Justice, including the United States Attorney's Office for the Southern District of New York; and (b) presidential pardon of Marc Rich or Pincus Green.

(GX 35).

[redacted] All five Marc Rich Lawyers have produced documents. The Marc Rich Lawyers have provided answers and produced documents relating to their conversations and communication involving third parties, including Denise Rich, Beth Dozoretz, Gershon Kekst, Avner Azulay, and Eric Holder. Communications between lawyers have been produced, where a third party was present or copied. But the Marc Rich Lawyers have also refused to answer certain questions or produce certain documents on the basis of the work product and attorney-client privileges. They have asserted these objections both at the direction of their client and based on their own interests as lawyers in their work product.[5]

The Government has made it clear that it is not seeking documents reflecting legal analysis or research or communications relating to legal issues such as, *inter alia,* the risk of extradition, the viability of the tax and RICO charges, and the technical legal requirements of petitioning for executive clemency. Nor is it seeking documents relating to other pending legal liabilities, such as, *inter alia,* potential state tax liabilities. Hence, the Marc Rich Lawyers need not produce responsive materials falling within these categories.

The Government notes, however, that the Marc Rich Lawyers have withheld communications between lawyers (where a third party was not participating) even though the conversations apparently consisted solely of conveying information obtained from a non-privileged source, such as a third party. [redacted] All five Marc Rich Lawyers have submitted privilege logs.

This motion followed. Rich and the Marc Rich Lawyers submitted a joint response. I heard oral argument on November 26, 2001.

## *DISCUSSION*

In moving to compel, the Government presents several arguments. First, invoking the "fugitive disentitlement" doctrine, the Government contends that Rich and Green are not entitled to the protection of the work product doctrine because they have been fugitives for some 17 years and they never contemplated returning to this country to litigate the criminal charges. Second, the Government argues that the materials in question are not protected by the work product doctrine because the Marc Rich Lawyers were acting primarily as lobbyists seeking to obtain a presidential pardon in a non-adversarial context rather than as lawyers providing traditional legal services. Third, the Government argues that, even assuming the ma-

---

**5.** The five Marc Rich Lawyers have submitted affidavits or declarations stating that they were functioning as lawyers, that they believed their communications with Rich and/or co-counsel would be confidential, and that they anticipated their work for Rich would have significant legal implications. [redacted]

terials in question constitute work product prepared in anticipation of litigation, it has demonstrated a substantial need for the materials sufficient to overcome any work product protection. Fourth, the Government contends that the Marc Rich Lawyers have invoked the attorney-client privilege in an overly broad manner, withholding materials that are not protected because they were not made for the purpose of obtaining legal advice, were purely factual in nature, or were not intended to be confidential.

Rich and the Marc Rich Lawyers respond by arguing that Rich and Green were not fugitives and that the materials sought by the Government are protected by both the work product doctrine and the attorney-client privilege. Specifically, they contend that the materials in question were prepared "because of" the indictment—indeed, to seek a resolution of the pending criminal charges—and "in anticipation of" further criminal, civil, and administrative proceedings as well. They also contend that the Marc Rich Lawyers were engaged in traditional lawyering and not merely lobbying when they were seeking to obtain pardons for their clients. Finally, they note that the Marc Rich Lawyers have produced many materials and that the Government has failed to show a substantial need for the additional materials sought because the evidence is available directly from the third parties in question.

I will first review the applicable legal principles and I will then apply the law to the unique facts of this case.

## A. *Applicable Law*

### 1. *Presidential Pardons*

The Constitution gives the President the "Power to grant Reprieves and Pardons for Offenses against the United States, except in Cases of Impeachment." U.S. Const. art II, § 2, cl. 1. A pardon is an "act of grace" that "exempts the individual, on whom it is bestowed, from the punishment the law inflicts for a crime he has committed." *United States v. Wilson*, 32 U.S. 150, 160, 7 Pet. 150, 8 L.Ed. 640 (1833). As the Supreme Court has long recognized, the President's power to pardon is "unlimited." *Ex Parte Garland*, 71 U.S. 333, 380, 4 Wall. 333, 18 L.Ed. 366 (1866); *see also United States v. Klein*, 80 U.S. 128, 147, 13 Wall. 128, 20 L.Ed. 519 (1871) ("To the executive alone is intrusted the power of pardon; and it is granted without limit."). The power "extends to every offence known to the law, and may be exercised at any time after its commission, either before legal proceedings are taken, or during their pendency, or after conviction and judgment." *Garland*, 71 U.S. at 380, 4 Wall. 333, 18 L.Ed. 366. Hence, the President has the authority to grant a pardon to an individual who has been charged with, but not yet convicted of, a crime.

■ The process of obtaining a pardon is not adversarial in nature. Rather, "[c]lemency proceedings are not part of the trial—or even of the adjudicatory process. They do not determine the guilt or innocence of the defendant, and are not intended primarily to enhance the reliability of the trial process. They are conducted by the executive branch, independent of direct appeal and collateral relief proceedings.... And they are usually discretionary, unlike the more structured and limited scope of judicial proceedings." *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 284, 118 S.Ct. 1244, 140 L.Ed.2d 387 (1998) (citations omitted); *see also Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458, 464, 101 S.Ct. 2460, 69 L.Ed.2d 158 (1981) (citations omitted) ("Unlike probation, pardon and commutation decisions have not traditionally been the business of

courts; as such, they are rarely, if ever, appropriate subjects for judicial review.").

According to the Rules Governing Petitions for Executive Clemency, which are guidelines only, pardon applications are to be addressed to the President and submitted to the Pardon Attorney at the Department of Justice. 28 C.F.R. § 1.1. No petition "should" be filed until after a waiting period of at least five years after the date of release from prison or, where no prison sentence was imposed, the date of conviction. *Id.* § 1.2. Upon receipt of a petition, the Attorney General is directed to cause an investigation to be made of the matter, "using the services of, or obtaining reports from, appropriate officials and agencies of the Government." *Id.* § 1.6. The rules do not specifically address pardon applications on behalf of individuals against whom charges are still pending, *i.e.*, individuals who have not been convicted.

## 2. *The Attorney–Client Privilege*

 The attorney-client privilege protects from disclosure communications between a client and a lawyer, where the lawyer is acting in a professional capacity and the client has communicated information to the lawyer in confidence for the purpose of seeking legal advice. *See Vingelli v. United States*, 992 F.2d 449, 454 (2d Cir.1993) (citation omitted) (attorney-client privilege "protects confidential communications made for the purpose of obtaining legal advice"); *see also United States v. Bein*, 728 F.2d 107, 112 (2d Cir. 1984). The party asserting the privilege bears the burden of establishing its existence, *see In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2d Cir.2000), and because the privilege "stands in derogation of the public's 'right to every man's evidence, ... it ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle.'" *Unit-*

*ed States v. Int'l Bhd. of Teamsters*, 119 F.3d 210, 214 (2d Cir.1997) (quoting *In re Horowitz*, 482 F.2d 72, 81 (2d Cir.1973)). This is particularly so in the context of grand jury investigations. *See, e.g., In re Grand Jury Subpoena Duces Tecum Dated March 24, 1983*, 566 F.Supp. 883, 885 (S.D.N.Y.1983) ("Privileges are carefully and narrowly construed in the context of the subpoenas of a grand jury....").

 Although the privilege does not attach to communications that are intended to be or are disclosed to third parties, the attorney-client privilege may cover "communications made to agents of an attorney ... hired to assist in the rendition of legal services." *United States Postal Serv. v. Phelps Dodge Refining Corp.*, 852 F.Supp. 156, 161 (E.D.N.Y.1994) (quotations and citations omitted). Confidential communications between a third party representative of the client, such as an accountant or other non-testifying expert, and the client's attorney, or between two different attorneys for a client, may be protected from disclosure if the communications are made on behalf of the client for the purpose of obtaining legal advice. *See Upjohn Co. v. United States*, 449 U.S. 383, 391–92, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981); *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir.1989), *cert. denied*, 502 U.S. 810, 112 S.Ct. 55, 116 L.Ed.2d 31 (1991); *In re Copper Mkt. Antitrust Litig.*, 200 F.R.D. 213, 217 (S.D.N.Y.2001) (citing Sup.Ct. Standard 503(b)); *see also United States v. Kovel*, 296 F.2d 918, 922 (2d Cir.1961) ("What is vital to the privilege is that the communication be made in confidence for the purpose of obtaining legal advice from the lawyer.").

## 3. *The Work Product Doctrine*

 The work product doctrine provides qualified protection from disclosure for documents and other tangible things

"prepared in anticipation of litigation or for trial." Fed.R.Civ.P. 26(b)(3); *see generally Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). Unless the privilege is overcome, it bars discovery "where a document was created because of anticipated litigation, and would not have been prepared in substantially similar form but for the prospect of that litigation." *United States v. Adlman,* 134 F.3d 1194, 1195 (2d Cir.1998); *see also Hickman,* 329 U.S. at 511, 67 S.Ct. 385. In particular, the work product doctrine protects materials reflecting "the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." Fed.R.Civ.P. 26(b)(3). Thus, "[t]he collection of evidence, without any creative or analytic input by an attorney or his agent, does not qualify as work product." *Riddell Sports Inc. v. Brooks,* 158 F.R.D. 555, 559 (S.D.N.Y.1994).

 The protection for work product is not absolute; it may be overcome if the party seeking discovery shows that it has a "substantial need" for the materials and is unable without "undue hardship" to obtain the substantial equivalent of the materials by other means. Fed.R.Civ.P. 26(b)(3); *see Adlman,* 134 F.3d at 1202–03. When the material in question is "core work product, consisting of an attorney's mental impressions, conclusions, opinions, or legal theories," as opposed to "ordinary fact work product," a " 'highly persuasive showing of need' " is required to overcome the protection. *McGrath v. Nassau Co. Health Care Corp.,* No. 00 Civ. 6454, 2001 WL 1549260, at *3 (E.D.N.Y. Nov. 30, 2001) (quotations omitted). Although most often applied in civil cases, the work product doctrine applies in criminal proceedings as well. *See In re Grand Jury Proceedings,* 219 F.3d at 190 (citing *United*

*States v. Nobles,* 422 U.S. 225, 238, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975)).

The work product doctrine is intended primarily to protect the role an attorney plays in the adversarial process. As the Second Circuit has noted, the doctrine seeks "to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries." *Adlman,* 134 F.3d at 1196 (quoting *Hickman,* 329 U.S. at 510–11, 67 S.Ct. 385); *accord In re Grand Jury Proceedings,* 219 F.3d at 190 (work product doctrine intended to provide lawyer with "essential zone of privacy, where the lawyer [can] work 'free from unnecessary intrusion by opposing parties and their counsel' ") (citations omitted).

 On the issue of whether material was prepared "in anticipation of litigation," the Second Circuit has held that the proper inquiry is "whether the documents were prepared 'because of' existing or expected litigation." *Adlman,* 134 F.3d at 1198. Under this test, documents are "deemed prepared in 'anticipation of litigation' if 'in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.' " *Strougo v. Bea Assocs.,* 199 F.R.D. 515, 520–21 (S.D.N.Y.2001) (quoting *Adlman,* 134 F.3d at 1202). The "because of" formulation does not, however, protect "documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of litigation." *Adlman,* 134 F.3d at 1202.

In the patent context, courts have held that documents prepared in contemplation of *ex parte* proceedings before the Patent and Trademark Office are not entitled to work product protection, unless they were

prepared "principally" for use in anticipated adversarial proceedings. *Golden Trade S.r.L. v. Lee Apparel Co.*, No. 90 Civ. 6291, 1992 WL 367070, at *4 (S.D.N.Y. Nov. 20, 1992) (citing cases).

### 4. *Lawyering v. Lobbying*

Lawyers sometimes act as lobbyists, and thus the issue has arisen as to whether the attorney-client and work-product privileges protect communications made and materials prepared in the course of a lawyer's lobbying efforts.

Of course, the inquiry is fact-specific. The fact that a lawyer occasionally acts as a lobbyist does not preclude the lawyer from acting as a lawyer and having privileged communications with a client who is seeking legal advice. Many lawyers "have expertise in special areas of knowledge that enhances their skill as lawyers, and that does not diminish their legal status." *Montgomery Co. v. Microvote Corp.*, 175 F.3d 296, 302 (3d Cir.1999).

■ On the other hand, "[i]f a lawyer happens to act as a lobbyist, matters conveyed to the attorney for the purpose of having the attorney fulfill the lobbyist role do not become privileged by virtue of the fact that the lobbyist has a law degree or may under other circumstances give legal advice to the client, including advice on matters that may also be the subject of the lobbying efforts." Edna Stein Epstein,

*The Attorney–Client Privilege & the Work Product Doctrine* 239 (2001). For example, "[s]ummaries of legislative meetings, progress reports, and general updates on lobbying activities do not constitute legal advice and, therefore, are not protected by the work-product immunity." *P. & B. Marina v. Logrande*, 136 F.R.D. 50, 59 (E.D.N.Y.1991), *aff'd mem.*, 983 F.2d 1047 (2d Cir.1992).

The *P. & B. Marina* case is instructive. There, the defendant used a lobbyist—described as a "legislative/political consultant" or "legislative attorney"—"to avert litigation by applying political pressure to federal agencies which could affect plaintiffs' marina operation." 136 F.R.D. at 58–59. The court rejected the argument that materials generated by the lobbyist were protected by the work product doctrine, noting that the lobbyist's correspondence was directed not towards "anticipated litigation but rather toward non-litigation means that could achieve the same results in lieu of litigation." *Id.* at 59.[6]

### 5. *The Fugitive Disentitlement Doctrine*

■ The "fugitive disentitlement doctrine" originated in the late 19th century; it provides that "the fugitive from justice may not seek relief from the judicial system whose authority he or she evades." Martha B. Stolley, *Sword or Shield: Due Process & the Fugitive Disentitlement*

---

**6.** *Accord United States Postal Serv. v. Phelps Dodge Refining Corp.*, 852 F.Supp. 156, 164 (E.D.N.Y.1994) ("Lobbying conducted by attorneys does not necessarily constitute legal services for purposes of the attorney-client privilege."); *Harper–Wyman Co. v. Connecticut General Life Ins. Co.*, No. 86 C 9595, 1991 WL 62510, at *3 (N.D.Ill. Apr. 17, 1991) (holding that documents prepared in connection with insurance industry's lobbying efforts were not protected by work product doctrine because lobbying efforts do not constitute litigation and documents in question were not

applied in an adversarial context, even though lobbying efforts might have been sparked by lawsuits against insurers); *North Carolina Elec. Membership Corp. v. Carolina Power & Light Co.*, 110 F.R.D. 511, 516–17 (M.D.N.C. 1986) (even though lobbying efforts opposing formation of proposed power generation and transmission system were coordinated by defendant's legal department, resulting communications between counsel and management were not privileged because they were not made to obtain legal advice).

*Doctrine,* 87 J.Crim. L. & Criminology 751, 752 (1997). Under the doctrine, "courts have the authority to 'dismiss the appeal of a defendant who is a fugitive from justice during the pendency of his appeal.'" *Empire Blue Cross & Blue Shield v. Finkelstein,* 111 F.3d 278, 280 (2d Cir.1997) (quoting *Ortega–Rodriguez v. United States,* 507 U.S. 234, 239, 113 S.Ct. 1199, 122 L.Ed.2d 581 (1993)). In fact, the Supreme Court has repeatedly held that "an appellant's escape 'disentitles' him 'to call upon the resources of the Court for determination of his claims.'" *Degen v. United States,* 517 U.S. 820, 824, 116 S.Ct. 1777, 135 L.Ed.2d 102 (1996) (quoting *Molinaro v. New Jersey,* 396 U.S. 365, 366, 90 S.Ct. 498, 24 L.Ed.2d 586 (1970)).

 The doctrine has been applied in both criminal and civil proceedings. *Empire Blue Cross,* 111 F.3d at 280. "The Second, Third, and Fifth Circuits have extended the fugitive dismissal rule to include cases in which defendants flee before filing notice of appeal." Jason W. Joseph, *The Fugitive Dismissal Rule Applied to Pre–Appeal Fugitivity,* 84 J.Crim. L. & Criminology 1086, 1090 (1994). Although the doctrine originated in the context of appeals, it is available in the trial context as well. *See, e.g., United States v. $129,374 in United States Currency,* 769 F.2d 583, 587–88 (9th Cir.1985) (doctrine may be applied in civil forfeiture proceedings), *cert. denied,* 474 U.S. 1086, 106 S.Ct. 863, 88 L.Ed.2d 901 (1986); *United States v. Veliotis,* 586 F.Supp. 1512, 1514 (S.D.N.Y.1984) (noting that court had discretion to apply disentitlement doctrine to bar fugitive from seeking release of restrained stock that Government was seeking to forfeit, but declining to do so and permitting fugitive opportunity to be heard through counsel).

The doctrine serves four rationales: "'1) assuring the enforceability of any decision that may be rendered against the fugitive; 2) imposing a penalty for flouting the judicial process; 3) discouraging flights from justice and promoting the efficient operation of the courts; and 4) avoiding prejudice to the other side caused by the defendant's escape.'" *Bano v. Union Carbide Corp.,* No. 00–9250, 2001 WL 1427210, at *5 (2d Cir. Nov. 15, 2001) (quoting *Empire Blue Cross,* 111 F.3d at 280).

The parties have cited only two reported decisions on the issue of whether the disentitlement doctrine precludes fugitives from asserting the attorney-client privilege; both cases held that fugitive status alone was an insufficient basis for denying a party the right to invoke the attorney-client privilege. *See United States v. Hurley,* 728 F.Supp. 66 (D.Mass.1990); *see also In re Grand Jury Subpoena Duces Tecum,* 391 F.Supp. 1029 (S.D.N.Y.1975). The parties have not cited any cases discussing the applicability of the fugitive disentitlement doctrine to a party's effort to invoke the work product doctrine.

## B. *Application*

I address first the issue of whether the disputed materials are protected from disclosure by the work product doctrine and second Rich's invocation of the attorney-client privilege.

### 1. *The Work Product Doctrine*

I hold that the disputed evidence is not entitled to protection as work product, for the materials in question do not reflect the mental impressions, thought processes, and legal theories that the work product doctrine is intended to protect.

First, as to the fugitive disentitlement doctrine, I conclude that although Rich and Green were fugitives for the period from the filing of the indictment to the granting of the pardons, their status as fugitives does not bar them from invoking

the work product doctrine. Second, I nonetheless conclude that their status as fugitives is highly relevant to the work product analysis, and I hold that Rich's reliance on the work product doctrine is misplaced because the process by which Rich and Green sought their pardons here was not an adversarial one; rather, it was an *ex parte* process that did not anticipate further litigation because it was clear that Rich and Green were never going to return to face the charges. Third, Rich is not entitled to invoke the work product doctrine because once the final efforts to persuade the Southern District to drop the charges had failed, he and his advisors changed tactics and the Marc Rich Lawyers started acting primarily as lobbyists rather than as lawyers. Finally, I address the Marc Rich Lawyers' argument that the materials in question constitute work product because all their efforts were "because of" the pending indictment.

### a) *The Fugitive Disentitlement Doctrine*

The Government argues that Rich and Green are barred by the fugitive disentitlement doctrine from invoking the work product doctrine. Rich argues that he and Green were not fugitives because they were not in the country when the indictment was filed in 1983, they were never arrested or arraigned, and they were never placed on bail. Two questions are presented: first, whether Rich and Green were fugitives, and second, if so, whether they are barred by the fugitive disentitlement doctrine from relying on the work product doctrine.

■■■■ First, I conclude as a matter of law that Rich and Green were fugitives. As Judge Weinstein has observed, "[a] person can be a fugitive even when he does not 'flee' but is simply found outside the jurisdiction." *United States v. All Funds on Deposit in Any Accounts Maintained at Merrill Lynch, Pierce, Fenner & Smith,* 801 F.Supp. 984, 998 (E.D.N.Y.1992) (citations omitted). A person who learns of charges against him while he is outside the jurisdiction "constructively flees" by deciding not to return. *United States v. 218 Panther Street,* 745 F.Supp. 118, 121 (E.D.N.Y.1990) (citation omitted); *see also Jhirad v. Ferrandina,* 536 F.2d 478, 483–84 (2d Cir.1976) (no "meaningful distinction exists between those who leave their native country and those who, already outside, decline to return"), *cert. denied* 536 F.2d 478 (1976); *United States v. Schreiber,* 535 F.Supp. 1359, 1363 (S.D.N.Y.1982) (individual who left the country in 1964 became a fugitive in 1966 when he learned he was under indictment and made no effort to return). One cannot be a fugitive in these circumstances unless (i) he was present in the jurisdiction at the time of the alleged crime, (ii) he learns, while he is outside the jurisdiction, that he is wanted by the authorities, and (iii) he then fails to return to the jurisdiction to face the charges. *Schreiber,* 535 F.Supp. at 1363; *All Funds,* 801 F.Supp. at 998.

Here, Rich and Green were both citizens of the United States, based in New York, at the time of the alleged criminal conduct. Approximately the end of 1982, while they were still in the United States, they learned that they were about to be indicted. They left the country shortly thereafter while their lawyers were negotiating a resolution of the impending criminal charges. The charges were not resolved and Rich and Green in fact were indicted. Their lawyers continued to seek to negotiate with the Southern District for a resolution of the charges, but the Southern District refused to carry on discussions because Rich and Green were unwilling to return to the jurisdiction to face the charges. Under all the circumstances,

then, Rich and Green were fugitives—they avoided prosecution and possible imprisonment by refusing to return to the jurisdiction to face the charges.

■ Turning to the second issue, I hold that even though Rich and Green were fugitives, they are not barred by the fugitive disentitlement doctrine from invoking the work product privilege. As the Government has conceded, no court has addressed this question in the work product context, and the two courts that have considered the fugitive disentitlement doctrine in the context of the attorney-client privilege declined to apply it. The disentitlement doctrine generally has been applied in cases where fugitives were seeking affirmative relief, such as where a fugitive who fled after a conviction then sought to overturn the conviction by filing an appeal. In contrast, in invoking the work product doctrine here, Rich and Green are not seeking any affirmative relief. Rather, they are merely asserting the privilege defensively in response to the Government's subpoenas.

Accordingly, I decline to apply the fugitive disentitlement doctrine and I will consider the work product objection on the merits. In doing so, however, I will take into account the fact that Rich and Green were fugitives, for, as discussed below, that fact is highly relevant to the work product analysis, including, in particular, to the issue of whether the pardon proceeding was "adversarial" in nature.

### b) *The Pardon Process Was Not Adversarial*

■ The principal purpose of the work product doctrine is to protect lawyers as they "develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by [their] adversaries." *Adlman*, 134 F.3d at 1196. Here, as the record shows, once the decision was made to seek a presidential pardon, the Marc Rich Lawyers had no adversaries and the proceeding was entirely *ex parte*. (*See* GX 22) (listing as a topic for discussion "need for secrecy and possibility/likelihood of potential leaks"). Neither the Southern District nor the Pardon Attorney at the Department of Justice was given notice. Although Quinn did contact Holder, he did so not to give "notice" of the Petition to the Department of Justice, but to enlist Holder's *support* for the Petition. (*See* GX 31) ("Dear Eric: . . . Your saying positive things, I'm told, would make this happen. . . . Jack.").

The fact that Rich and Green were fugitives is significant in this context. They left the country when they knew they were about to be indicted and they refused for some 17 years to return to participate in our adversarial system of justice. The parties had reached an impasse and thus there was no potential for further litigation of the criminal charges. Rich and Green were not going to come back to face the charges if the application for a pardon were rejected. And there would be no criminal charges to litigate if the application were granted.

Under these circumstances, the rationales underlying the work product doctrine do not apply. Application of the work product doctrine here would *not* promote the fair and efficient functioning of the adversarial system of justice.

Rich argues that the pardon proceedings were not *ex parte* because he was not required to give notice to the Department of Justice or the Southern District. In particular, he argues that the executive clemency regulations do not apply to pardon petitions submitted *directly* to the White House or to petitions submitted by a person who has not yet been convicted. (Resp't Mem. at 15 n. 34).

These arguments are rejected. The regulations provide that a pardon petition "shall be addressed to the President ... and shall be submitted to the Pardon Attorney." 28 C.F.R. § 1.1. No exception is made for petitions submitted "directly" to the White House. If Rich's interpretation were correct, every pardon applicant could circumvent the Department of Justice by submitting the pardon petition "directly" to the White House. In addition, although the regulations do not specifically address pardon petitions submitted on behalf of individuals not yet convicted, the language of § 1.1 suggests it applies to all pardon petitions. It contains no limitations. Moreover, although convicted individuals are instructed in a different subsection that they "should" wait five years before applying, 28 C.F.R. § 1.2, this provision does not mean that the regulations are inapplicable to unconvicted individuals. It makes no sense that individuals who seek a pardon before they are convicted are free to follow whatever procedures they wish.

Finally, § 1.6(a) provides that the Attorney General "shall cause such investigation to be made of the matter as he or she may deem necessary and appropriate, using the services of, or obtaining reports from, appropriate officials and agencies of the Government, including the Federal Bureau of Investigation." Surely, the Southern District was such an "appropriate" agency. If the guidelines set forth in the regulations had been followed, the Petition would have been submitted to the Pardon Attorney, the Department of Justice would have caused an investigation to be made, the Southern District would have been consulted, and the proceedings would not have been *ex parte*.

#### c) *The Marc Rich Lawyers Were Acting Principally as Lobbyists*

The Government's motion must also be granted because once the decision was made to seek the pardons, the Marc Rich Lawyers were acting principally as lobbyists and not primarily as lawyers.

Fink's testimony before the House Government Reform Committee is telling. He had become "highly frustrated" as his "efforts to approach this *simply as an attorney*" had not been successful. (GX 13) (emphasis added). Hence, he decided to seek assistance from not just another attorney but someone who was "Washington wise," who understood "the entire political process." (*Id.*). That person turned out to be Quinn.

Although Quinn may be an excellent attorney, he was preceded by a series of excellent attorneys; clearly, he was not hired for his ability to formulate better legal arguments or write better briefs. To the extent it contained legal arguments at all, the Petition made the same arguments that Rich and his prior attorneys had been presenting, unsuccessfully, to the Southern District for almost 17 years. Rather, Quinn was hired because he was "Washington wise" and understood "the entire political process." He was hired because he could telephone the White House and engage in a 20–minute conversation with the President. He was hired because he could write the President a "personal note" that said "I believe in this cause with all my heart," and he would know that the President would read the note and give it weight. (GX 26).

In his testimony before the House Committee on Government Reform, Quinn acknowledged that "the legal work on this matter at all of these firms, Mr. Fink's, Mr. Libby's and so on, basically shut down sometime around the end of March [2000]." It was around that time that Rich's advisors—which included several non-lawyers in prominent roles—revisited

the idea of "send[ing] DR on a 'personal' mission to NO. 1, with a well prepared script." (GX 16). At that point the efforts shifted to a lobbying effort: identifying and contacting individuals (including government officials in Israel) who could support the Petition, enlisting individuals who had access to the President, and considering how to deal with the media and public reaction. (*See, e.g.*, GX 22) ("Maximizing use of Gershon"; "Maximizing use of D.R. and her friends").

These efforts are not the type of efforts that the Supreme Court had in mind in *Hickman v. Taylor* when it held that an attorney's mental impressions, conclusions, opinions, or legal theories were entitled to protection from disclosure. The public relations consultants and media experts here were not helping the lawyers to prepare for litigation. It was the other way around, as the lawyers were being used principally to put legal trappings on what was essentially a lobbying and political effort. Once the decision was made to file the Petition, the lawyers were engaged primarily in lobbying activity, working with and sometimes at the direction of non-lawyer public relations consultants and lobbyists. (*See, e.g.*, GX 15) (Azulay: "The present impasse leaves us with only one other option: the unconventional approach ... which I have been proposing all along."), [redacted] ). And once the Petition was granted, the lawyers were engaged primarily in "spin control," again at the direction of the public relations consultants. (*See, e.g.*, GX 32 (Azulay: "we agreed that all inquiries, interviews should be channeled to gershon")). This work could have been done by non-lawyers and did not require legal expertise.

### d) *The "Litigation" Was Over*

Finally, Rich and the Marc Rich Lawyers argue that their work is protected by the work product doctrine because all their efforts were "because of" existing litigation—the charges pending in the indictment. But it does not follow that all action taken by counsel after the filing of the indictment was "because of" litigation. Rather, it was clear, as of February or March 2000, that there would be no further litigation with respect to the criminal charges—"litigation" with respect to the indictment was over. Again, as Quinn testified, "the legal work ... was basically done." All that was left was the non-adversarial lobbying effort to persuade the President to grant the Petition. In fact, the Petition itself noted that "this case will not be resolved through trial, settlement or the withdrawal of the indictment." (GX 1, at 30). And because the President's decision was unreviewable, no further litigation would follow.

Rich and his lawyers also argue that the possibility of other civil and administrative proceedings was always a factor as they were preparing and advocating for the Petition. The argument is rejected. Clearly, when the Marc Rich Lawyers were making their lobbying efforts to secure a presidential pardon, they did not have "an eye toward" future civil or administrative proceedings. The documents relating to the pardon application were not "prepared principally to assist in [these other] anticipated adversarial proceedings." *Golden Trade*, 1992 WL 367070, at *4.

### 2. *The Attorney–Client Privilege*

 The Marc Rich Lawyers, at Rich's direction, have taken an overly broad view of the attorney-client privilege. Hence, the Government's motion is granted in this respect as well.

Rich, Green, and the Marc Rich Lawyers may only invoke the attorney-client privilege with respect to confidential communications made for the purpose of ob-

taining legal advice. This includes communications between or among (i) clients and lawyers; (ii) different lawyers; and (iii) lawyers and third-party consultants hired by the lawyers to assist in the giving of legal advice—but only where the communications were made in confidence for the purposes of obtaining and giving legal advice.

█ Conversations between lawyers where one lawyer is merely relaying factual information, such as a conversation with a third party, to another lawyer are not privileged (or protected by the work product doctrine). Communications about non-legal issues such as public relations, the solicitation of prominent individuals or persons with access to the White House (such as Denise Rich and Beth Dozoretz) to support the Petition, and strategies for persuading the President to grant the petition are not privileged (or protected by the work product doctrine). The lawyers' reports to the clients on these non-legal items and lobbying efforts are not privileged (or protected by the work product doctrine).

### CONCLUSION

For the reasons set forth above, the Government's motion to compel is granted. The Government shall submit a proposed order, on notice, within ten business days hereof, after conferring with counsel for Rich and the Marc Rich Lawyers in an effort to agree on language. If agreement cannot be reached, any objections to the Government's proposed order are to be submitted within three business days thereafter. The order shall include a provision for *in camera* review by the Court of any documents that remain in dispute.

SO ORDERED.